IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANN HILL,                              )
                                       )
                Plaintiff,             )     2:09-cv-01565-GEB-GGH
                                       )
        v.                             )     ORDER
                                       )
COUNTY OF SACRAMENTO, ROGER            )
DICKINSON, ROBERTA MACGLASHAN,         )
SUSAN PETERS, JIMMIE YEE, DON          )
NOTTOLI, SACRAMENTO AIRPORT            )
SYSTEM, and G. HARDY ACREE             )
inclusive,                             )
                                       )
                Defendants.            )
_____)

        Plaintiff Ann Hill ("Hill") seeks a preliminary injunction

that would allow her to continue operating her Java City coffee

business in Terminal A of the Sacramento International Airport after

expiration of the sublease into which she entered with HMS Host

International, Inc. ("Host").  The sublease expires midnight on July

31, 2009.  Hill argues the County of Sacramento ("the County"), which

owns and operates the Airport and contracted with Host to provide food

and beverage concessions at the Airport, should be prevented from

excluding her minority owned business from Terminal A, since the

exclusion is because she is an African American.  Hill argues this

1

exclusion violates the federal Equal Protection Clause and Title VI of the Civil Rights Act.  Title VI proscribes excluding a person from participation in "any program or activity receiving Federal financial assistance" "on the ground of race." 42 U.S.C. §2000d.  The County receives Federal financial assistance to operate the Airport. Further, the Equal Protection Clause can be violated by purposeful racial discrimination.  Regents of University of California v. Bakke, 438 U.S. 265, 287 (1978)(explaining Title VI's prohibition against racial discrimination is coextensive with that of the Equal Protection Clause).

Hill also seeks an order compelling the County to comply with duties Hill asserts are mandatory and enforceable by her under California Code of Civil Procedure Section 1085; specifically, Hill argues the County has failed to comply with public duties embodied in federal regulations prescribed in 49 C.F.R. Parts 23 and 26.

Host decided against renewing its lease with Hill and to replace Hill's business with a Starbucks store that Host anticipates will generate more revenue than Hill's business has generated.  This is shown in the amended contract Host entered with the County in which Hill's business is identified as an under performing business compared to other revenue generating businesses at the Airport.

The County and Host entered into an amended contract that resulted in Host eliminating businesses from Terminal A which failed to generate the desired revenue.  The County had previously entered into a contract with Host under which Host was to provide, both directly and through sublease with various food service providers, food and beverage concessions at the Airport.  (Stanton Decl. at ¶ 2.) That contract authorized Host to "decide on the type of food and

beverage concepts to provide in the leased space at the Airport."

(Id. at ¶ 3.)  Host's lease payments to the County "are based upon an

agreed percentage of gross revenues of the sub-leases that Host has

under contract . . ." (Id.)  "In 2007, the County and Host began

negotiating [the] amended contract [at issue], a purpose of which

> was to provide an extension to Host for its lease
> so that it could continue to sublease space to
> food and beverage vendors in Terminal A, but to
> also permit [the] County to begin the process of
> entering into lease agreements for the providing
> of food and beverage services for a new structure,
> Terminal B.  This new terminal is scheduled, at
> the present time, to open in January 2012.
> Additionally, as part of the amendment, Host
> agreed to make substantial capital improvements to
> refresh and update the concepts available to the
> customers at the Airport in order to increase
> revenue flow, and ultimately, the revenue
> percentages paid to Sacramento County under the
> lease with Host.
>
> As part of its plan to increase revenue, Host
> wanted, and agreed, to change three under
> performing vendors that Host had under contract in
> Terminal A. These entities included Mrs. Hill's
> Java City, TCBY Yogurt, and Manchu Wok. TCBY was a
> frozen yogurt business, and Manchu Wok sold Asian
> food. This changeover was a term requested by
> Host, not the County, as part of its plan to
> increase revenue flows in response to the County's
> stated desire to increase food and beverage
> revenues, and was ultimately incorporated in the
> terms of [an] amendment to the contract.
>
> The reason for these changes was because these
> entities were the lowest revenue producers of all
> of the food and beverage vendors under lease with
> Host based upon an analysis of revenue per
> enplaned passenger over the relevant time period.
> Ms. Hill's Java City was the second worst
> performer for four of the five past years. As a
> result, Host, not Sacramento County, decided it
> needed to replace Ms. Hill's Java City with a
> Starbucks Coffee outlet, which was one of the
> highest per passenger revenue producers in
> Terminal A.

(Stanton Decl. at ¶¶ 5-7.)

/ / /

The amended contract into which the County and Host entered removed from Host the exclusive leasing rights it had previously been granted at the Airport, and subjected Host to liquidated damages if it did not take action to develop new business concepts that would generate more revenue.  This contract obligated Host to invest $3,500,000 to develop the new business concepts that would generate more revenue.  (Caso Decl. Ex. A.)  If Host failed to have the new concepts under construction by July 1, 2007, Host agreed to pay the County a penalty of $15,000 per month per venue that was not under construction as compensation for the reduced revenues received from the non-updated food venue.  (Id.)

After the contract was so amended, Host started to negotiate with Hill to buyout the remaining 18 months of her sublease, and made monetary offers to her.  (Stanton Decl. ¶ 10.)  Hill countered with a request for $1,076,000.  (Id. at Ex. D.)  Host countered this request with a $500,000 offer, which expired January 25, 2008.  (Id.)  Hill did not accept this buyout offer.

Hill filed a discrimination complaint with the Federal Aviation Administration ("FAA") on January 31, 2008.  (Id. at Ex. E.) Hill alleged in that complaint that the Airport had harassed and discriminated against her because of her race in violation of the Disadvantaged Business Enterprises ("DBE") program regulation (49 C.F.R. Part 23); specifically the FAA states Ms. Hill alleged the following:

> 1.   The Airport allowed HMS Host to harass and discriminate against her because of her race (African-American) in violation of the DBE program regulation 49 CFR Part 23. She stated that some examples of the alleged discrimination are: HMS

1              Host told her that she was only at the airport
               because she is a DBE and that she merely had a
2              "job", not a business; and they made her employees
               feel uncomfortable while at work.
3

4       2.     The Airport is not in compliance with FAA DBE
               program regulations as required by 49 CFR
5              Part 23[,] [and] provided [the following]
               examples of the alleged violations []:
6

7       a.     The Airport allowed HMS Host to overcharge
               her on her rent;
8       b.     The Airport may be circumventing FAA's rule
               on "no bid contracts";
9
        c.     The Airport has no outreach program;
10
        d.     She was not made aware of the Airport's plan
11             to amend its Concession Agreement, and she
               was not given the opportunity to provide
12             input;

13      e.     There was no DBE Liaison Officer (DBELO) at
               the Airport for years, and;
14
        f.     The Airport has allowed HMS Host to exclude
15             her from the current contract; therefore, her
               contract will be terminated in 2009. (Ex. F.
16             1-2)

17           The FAA investigated Hill's claims and determined that the

18   Airport was in compliance with law applicable to Hill's allegations

19   and no discrimination was found. (Id.)

20           Hill subsequently filed a second complaint with the FAA in

21   which she alleged the Airport retaliated against her because she filed

22   her first complaint when "Host sent her bills that she had already

23   paid."  The outcome of the FAA's investigation into this complaint

24   follows:

25           The investigation did not uncover any specific
             evidence of retaliation by HMS Host or Sacramento
26           International Airport.

27           Sacramento International Airport stated that they
             had not previously been made aware of any problems
28           with Ms. Hill's lease payments.

> HMS Host stated that it is their standard business practice to send a letter, such as the one that was sent to Ms. Hill, requesting payments for past due rent and fees.
>
> HMS Host stated that they had sent several invoices to Ms. Hill during the time period of January, 2007 to March, 2008.  This confirms that they had been requesting past due payments from her well in advance of the date [she] filed [her] complaint of January 31, 2008 . . . .
>
> The FAA has determined that the Sacramento International Airport is in compliance with the aforementioned statutes in regard to the allegations in this complaint and has found no discrimination.

(Id. at Ex. G.)

Following these FAA responses, Hill commenced this federal lawsuit in which she alleges the County discriminated against her based on her race, and because of this discrimination her sublease was terminated.  (Pl. ['s] Mem. of P. & A. at 10.)  Hill alleges that the County racially discriminated against her by treating her differently than other businesses as follows: by placing her business in an undesirable location, refusing her permission to place a sign near her corridor, by entering into the amended contract in which all contractual protections for DEB businesses were removed, and by targeting her business for closure in the amended contract.  (Id. at 12.)

"To obtain a preliminary injunction [Hill] was required to demonstrate either:  (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [her] favor."  Walczak v. EPL Prolong, Inc., 198 F.3d 725, 731 (9th Cir. 1999).

1  / / /

2  / / /

3          Hill has not shown a likelihood of success on the merits of

4  her claims against the County, nor that she has raised serious

5  questions involving the merits or that the balance of hardships tips

6  sharply in her favor.  Although Hill argues she has an undesirable

7  business location in Terminal A, for which the County is responsible,

8  she has not provided evidence from which a reasonable inference can be

9  drawn that the County is responsible for where her business is located

10 in Terminal A.  The record shows that Host made the decisions

11 regarding the locations of the subleasing vendors.

12          The County concedes that under Hill's sublease with Host

13 signs had to be approved by the County and Host.  The County presents

14 a letter in which it responded Hill's letter dated May 7, 2008, and

15 approved Hill's request for "new signage . . . for The Java City kiosk

16 on the Terminal A concourse. (Stanton Decl. Ex. I).  In that response

17 letter the County, however, did not approve Hill's request for "free-

18 standing signage placed in the central mall area" because of

19 "operational and safety reasons."   Hill has not shown this denial

20 evinces racial discrimination.

21          Hill's evidence does not support drawing the inference that

22 the County took action against her business interests based upon

23 racial discrimination.  The FAA findings on Hill's complaints also

24 support the County's position that it has not unlawfully discriminated

25 against Hill, and indicate that Hill's claims under Cal. Code Civ.

26 Proc. § 1085 are unavailing.  Although Hill declares the County

27 violated a mandatory federal public duty when it failed to provide her

28 with more notice than the public was provided before the County

considered whether to enter into the amended contract, Hill has not
shown that the County had this mandatory duty.  The regulation on
which Hill relies simply gives "examples of race-neutral measures
[that can be] implement[ed:]" one of which is "notifying [Airport
concession DBEs] of concession opportunities . . . when appropriate .
. . [and] when practical, . . . so as to encourage and facilitate the
participation of [Airport concession DBEs]."
49 C.F.R. § 23.25.

        Hill also alleges the County is in violation of its duty to
comply under 49 C.F.R. § 23.59, when it set a goal of 6.64% as the
rate at which DBEs would be expected to share in airport concession
business in the absence of discrimination, which fell below the
national aspirational goal of 10%.  (Pl. ['s] Mot. at 13, 14.)
However, Hill has not shown she has standing to raise this issue since
she is already an Airport concession DBE.  Even if this issue should
be reached the County declares it is now in compliance with this
section since it amended a mathematical error in its DBE program to
state that its goal of 15.06%.  (Stanton Decl. at ¶ 21.)  This
declaration is not controverted with sufficient evidence.  Hill also
challenges the omission of DBE language from the amended contract but
has not shown she has standing to challenge the omission, since
nothing on record shows she has tried to become an Airport Concession
DBE; rather, she is trying to have an order issued that would in
effect allow her business to remain in Terminal A after her lease
expires.  Therefore, Hill has not shown a likelihood of success on the
merits of these claims.

        Nor has Hill shown a likelihood of success on the merits of
her claims that the County engaged in racial discrimination when it

1   entered into the amended contract that does not extend her sublease

2   with Host.  The County's declared purpose for the amended contract,

3   which is to increase competition and revenue, has not been

4   controverted by Hill with sufficient probative evidence.  (Stanton

5   Decl. ¶ 23.)  Nor has the County's explanation that Host sought to

6   meet the County's goal of increasing its revenue by negotiating a buy-

7   out of underperforming businesses in order to begin re-concepting the

8   spaces by July 1, 2007, as required under the amended contract, been

9   shown to be a pretext for racial discrimination.  (Caso Decl. Ex. A.)

10  See Village of Arlington Heights v. Metropolitan Housing Development

11  Corp., 429 U.S. 252, 270 (1977) (stating discriminatory impact is

12  insufficient in itself to support a conclusion of discriminatory

13  purpose.)

14          Finally, Hill has not shown that the loss of her business

15  as a result of Host's failure to extend the lease constitutes

16  irreparable injury or tips the balance of hardships in her favor.

17      Therefore, Hill's motion for a preliminary injunction is denied.

18  Dated:  July 30, 2009

19

20  _____
    GARLAND E. BURRELL, JR.

21  United States District Judge

22

23

24

25

26

27

28